LOBUZEK v. AMERICAN CAR & FOUNDRY CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION LAW—DEPOSITIONS—EVIDENCE.

Where claimant wife had resided in Austria seven years previous to the husband's death, depositions taken in Austria to establish such relationship without letters rogatory, notice to the opposite party, or in compliance with the rules of the industrial accident board, were not admissible in evidence in proceedings for an award under the workmen's compensation act.[1]

2. SAME—EVIDENCE—FOREIGN AFFIDAVITS—ADMISSIBILITY.

Where no witness testified to knowing deceased both in Austria and America and could identify him as claimant's husband, and a so-called "protocol" purporting to contain the testimony of claimant and her witnesses, taken before

[1]On application and effect of workmen's compensation acts, generally, see comprehensive note in L. R. A. 1916A, 23.

a probate judge in Austria, could not be admitted as a foreign affidavit under the laws of Michigan (Act No. 191, Pub. Acts 1909, 3 Comp. Laws 1915, § 12502), and, if authenticated as a foreign affidavit, could not be substituted to prove, in a contested case, facts which can only be shown by competent oral evidence or legal depositions duly taken after notice to opposing parties, there was no competent evidence to sustain an award to claimant.

Certiorari to Industrial Accident Board. Submitted October 18, 1916. (Docket No. 9.) Decided January 23, 1917.

Mary Lobuzek presented her claim for compensation against the American Car & Foundry Company for the death of her husband in defendant's employ. From an order awarding compensation, defendant brings certiorari. Reversed.

*Alexander, Cotter & MacCord* (*G. A. Orth*, of counsel), for appellant.

*John F. Berry, Thomas A. Lawler*, and *Leopold A. Koscinski*, for appellee.

Steere, J. On August 12, 1913, an employee of defendant named Ignatz Lobuzek sustained fatal injuries at its foundry in the city of Detroit as the result of being caught by an ascending elevator in the doorway of the shaft, upon the second floor. An award of full compensation for his death was made to plaintiff, as his wife living with him at the time of his death, by an arbitration committee, and affirmed by the State industrial accident board under Act No. 10, Extra Session 1912 (3 Comp. Laws 1915, § 5423).

Defendant urges that this award is erroneous and without authority of law for the reason that the evidence failed to show the accident causing Lobuzek's death arose out of or in the course of his employment, and that certain claimed documentary evidence pur-

porting to have been taken in Austria was erroneously received and considered by the board, without which there was a total absence of proof as to plaintiff's rights or existence, and which, even if it were admissible as evidence, fails to identify deceased as her husband or to show that she was living with him at the time of his death and wholly dependent upon him for support, but, on the contrary, shows that for about seven years prior to his death he had lived in America and she in Austria, where she had employment during much of that time.

Deceased was a native of Austria, and apparently did not speak or understand the English language to any extent; his communications being chiefly with and through fellow workmen of his nationality who spoke English and could interpret. None of them gave any testimony as to his domestic relations or what part of Austria he came from.

The application for compensation preferred to the industrial accident board is in the name of Ernest Ludwig, of Cleveland, Ohio, acting consul of Austria-Hungary, under power of attorney purporting to be signed by Mary Lobuzek, of the province of Galicia, Austria, which does not appear to be authenticated by an American consul, as the published ruling of the industrial accident board demands.

Deceased was employed in defendant's foundry as a "charger," working with others under direction of the "cupola tender," at throwing iron into, or charging, the furnace in the process of smelting. The charging room of the foundry was located upon the second floor. Two sets of stairs ran to it from the ground floor for the employees to use as occasion required. The building was equipped with two freight elevators supplied with electric power and operated by the manipulation of ropes or lines causing them to ascend, descend, or stop as the operator desired. The elevator

in the north shaft, where the accident occurred, stopped at the second floor; the shaft entrance from the charging room being protected by an automatically operated guard gate about breast high which the ascending elevator caught and raised leaving an open doorway from it to the charging room when it stopped on that floor. When it descended the guard gate went down with it by gravity to its former position, again protecting the shaft doorway on that floor. The purpose and use of the elevators was to carry pig iron and other material up and down in the building as business demanded. They were in charge of an elevator operator employed especially to care for and run them. It was no part of deceased's duty to use or operate them. He had been personally cautioned against attempting it, and the men were instructed generally that it was against the rules for them to operate the elevators. So far as the testimony discloses, he did not know how to run the elevators, and had not previously tried to do so.

On the morning of the accident a workman in the charging room named Lawrence, one of the older employees who had at one time been an elevator operator, but was then working as a charger, took a wheelbarrow and went into the elevator at the floor of the charging room to go down and outside the building to get a load of sand with which to cover the bottom of the furnace. Deceased stepped into the elevator with him and rode down. The elevator was so constructed that it stopped automatically on the ground floor, and the operator did not accompany them, but remained on the second floor, starting the elevator down by reaching into the shaft and pulling the proper rope. He then went a few steps from the shaft to the stair doorway, where he could see out and watch Lawrence get his sand from a pile outside, and sat down. Deceased did not accompany Lawrence, who loaded his wheel-

barrow and returned to within about 20 steps of the elevator, where he sat down to rest. While watching him the operator heard an outcry, and, turning towards the shaft, saw deceased caught between the elevator and the ceiling of the second floor with his legs hanging down outside, the toes pointing out. Lawrence had occupied about 15 minutes in getting the sand and returning to where he sat down. Where deceased was during that time, what he did, and how the accident happened, except its finality, are undisclosed beyond the confused testimony, through an interpreter, of a witness named Lasczak, who testified that he stood in the charging room on the second floor and saw deceased come up alone in the elevator to that floor, get out, and reach over the gate to pull the cord to send the elevator down, saying:

"He must have got the wrong line, because instead of going downward it shot up, and the gate caught him, * * * and he was taken upward with the elevator. When I saw that, I got frightened very much, and I ran down the stairs, taking the stairway."

A protracted attempt by counsel to get some light on how the gate caught him after it had been raised by the ascending elevator before he could get out led to a series of confused and conflicting answers, of which the interpreter said, "He is all balled up," the witness said, "I explained it more than about six times how it could be down," and the chairman of the board said, "I think we will simply waste time on it any way." His testimony, if of any significance, is but confirmatory of the undisputed evidence that deceased was not assisting Lawrence, was alone in the elevator without any tools or articles indicating a mission in the line of his duties, and lost his life in attempting to operate the elevator in violation of instructions. Operating an elevator was not in the line of nor a risk incident to his employment as a charger. It was a

forbidden danger of his own choosing, and we fail to find any evidence in the record disclosing that he was on the elevator for any special purpose of his employment at the time of the accident. No findings were made by the accident board revealing the theory under which it was concluded the injury "arose out of" deceased's employment.

But, if it be conceded that the record furnishes support for such conclusion as to the accident itself, the award to plaintiff is manifestly based upon claimed foreign depositions taken in a contested case without notice, and not entitled to recognition, not only under well-established elementary rules of evidence in contested judicial and *quasi* judicial proceedings, but under a wise, fair, and well-worded rule of practice approved and promulgated by the Michigan industrial accident board for cases of this kind, which is as follows:

"*Foreign Dependents—Letters Rogatory and Proofs —Practice in.*—The following practice in the above cases is approved and established by the board:

"(1) In case it is necessary to take the testimony of witnesses in a foreign country, the person desiring such testimony shall apply to the board for the issuance of letters rogatory by petition to which shall be attached the interrogatories which he desires to have propounded to the witnesses whose testimony is to be taken; he will also attach thereto a copy of the order proposed in the case, and shall serve copies of all of said papers upon the opposite party or his attorney, the time for such service to be the same as provided in the circuit court rules of Michigan. A notice should also be attached to the papers so served stating the time when the same would be presented to the board for issuance, and further stating that the opposite party may propose and submit at the time aforesaid cross-interrogatories to be attached to said letters, and propounded to the witnesses whose testimony is to be taken.

"(2) That at the time fixed in said notice such

original petition with proof of service attached thereto may be presented to the board, and also any proposed cross-interrogatories, or objections or motions whether made orally or in writing, and the same will be passed upon by the board.

"(3) The board will issue as of course such letters in all cases except where substantial reasons are affirmatively shown against said issuance, the same to be authenticated by the secretary of the board signing the same and attaching the seal of the board thereto. That in such cases the cross-interrogatories proposed by the opposite party will be attached to the letters as of course, except where it is made to appear that they are impertinent or irrelevant."

Michigan Workmen's Compensation Cases (1916), p. 428.

In this case no witness was produced who testified to knowing deceased both in Austria and America and could identify him as plaintiff's husband. In fact, the only tendency in the *ex parte* claimed foreign depositions to so identify him was his name. By them it appeared plaintiff had not seen her husband of that name since he left her in Galicia seven years before, and his last address furnished to her in a letter from him was: "Jest Wiwian, W. Va. No. 294." That it was necessary to take the testimony of witnesses in a foreign country to establish her right to compensation under any aspect of the case is too manifest for discussion. Not only were the rules of the board entirely ignored, but the so-called "protocol" purporting to contain the testimony of plaintiff and her witnesses taken before a probate judge of Bochnia, Austria, could not be admitted as foreign affidavits under the laws of this State (Act No. 191, Pub. Acts 1909 [3 Comp. Laws 1915, § 12502]) ; and, if authenticated as a foreign affidavit, it could not be substituted to prove, in a contested case, facts which can only be shown by competent oral evidence or legal depositions duly taken after notice to opposing parties.

We are of opinion that the industrial accident board had before it no competent evidence to sustain the award made, and its decision must therefore be reversed.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, and BROOKE, JJ., concurred. PERSON, J., did not sit.