# STATE OF NORTH DAKOTA EX REL. EILEEN E. STORM, Respondent-Appellant, v. JAMES E. HOUGHT, David M. Hought, Fred W. L. Kohlman, and John M. Nelson, Also Known as John M. Nelms, Appellants-Respondents.

(— A.L.R. —, 219 N. W. 213.)

**Master and servant — workman working where he was forbidden to work does not necessarily prevent compensation.**

1. Where an employee is injured while doing work that he is employed to do, the fact that at the time the injury was received he was working at a place where he had been forbidden to work is not necessarily fatal to a claim for compensation.

**Master and servant — miner killed in place he was forbidden to work held not as matter of law caused by injury outside employment.**

2. A miner was killed by coal falling from overhead in a room in which he had completed mining operations the day before and which was adjacent to the place where he was assigned to work on the day his injury was received. It is *held* that, though he had been forbidden to longer work in the room where operations had recently been discontinued and where his injury was received, it cannot be said, as a matter of law, either that the injury was sustained outside of the course of the employment, or that it was caused by the wilful intention of the employee to injure himself or another.

**Master and servant — evidence held to support verdict that defendants were employers of deceased miner at time of injury.**

3. The evidence is examined and held sufficient to support the verdict of the jury to the effect that the defendants were the employers of the deceased at the time of the injury.

**Master and servant — certain evidence held admissible.**

4. Where only one of the defendants testified upon the trial and where his testimony in general tended to show that he was the sole employer of the deceased, evidence to the effect that he immediately notified another defendant by telegram of the happening of the accident and that the latter promptly came in response to the telegram and both interviewed the widow of the deceased for the purpose of effecting a settlement, is *held* to have been properly

---

Note.—(1, 2) Injuries received while going into or remaining in forbidden place as injuries arising out of or in the course of the employment within meaning of Workmen's Compensation Act, see annotation in 23 A.L.R. 1172; 26 A.L.R. 167; 5 R. C. L. Supp. 1572; 6 R. C. L. Supp. 1759.

admitted as showing conduct amounting to an admission and for its impeach‧ing tendency.

Opinion filed February 24, 1928.  Rehearing denied April 16, 1928.

Workmen's Compensation Acts, — C. J. § 77 p. 86 n. 82.

Appeal from the District Court of Divide County, *Lowe,* J.

Judgment affirmed and order reversed.

*George P. Homnes,* for respondent-appellant.

The rule seems to be well settled that in actions against alleged partners less proof is requisite to establish the partnership than is necessary in actions between the parties themselves.   Frakel v. Hiller, 16 N. D. 387, 113 N. W. 1070.

Where a partnership is shown to exist, there is a presumption of its continuance, until notice of its dissolution is given to those dealing with it.   30 Cyc. 419.

Persons entering jointly into an undertaking may be copartners, and the joint interest makes them liable, whether they are partners or not. Purvis v. Butler, 87 Mich. 248, 31 N. W. 513.

Where one by his course of dealing with another leads third parties to believe in the existence of a copartnership, those dealing with the firm under such belief are entitled to hold responsible all the apparent members of the firm.   Jansen v. Jacobson, 112 Minn. 520, 128 N. W. 824.

Where the correctness of the verdict depends on the credibility of witnesses, it should seldom be disturbed.   29 Cyc. 830.

Ordinarily the question whether a servant was acting within the scope of his employment at the time he was injured is for the jury.   18 R. C. L. 582.

"The supreme court will not review the evidence taken before a commission in a proceeding under the Workmen's Compensation Act, and pass upon its weight, where there appears to be a substantial conflict." Utah Apex Min. Co. v. Industrial Commission, 49 A.L.R. 415, 248 Pac. 490.   See also 28 R. C. L. 828, 829.

"An injury sustained by a workman who, after having been discharged, obtained leave to go down into the mine for the purpose of bringing up his tools, was held to have arisen out of and in the course

of the employment." Molloy v. South Wales Anthracite Colliery Co. 4 B. W. C. C. 65.

*E. R. Sinkler* and *G. O. Brekke,* for respondent.

"Any agreement taking the partnership out of the operation of the usual rule must, however, be shown distinctly and by satisfactory evidence." 22 Am. & Eng. Enc. Law, 2d ed. 200.

It is well established that the burden of proof is upon the claimant to establish that the injury was received in the course of the employment; and unless there is employment there can be no injury in its course. Dehn v. Kitchen, 54 N. D. 199, 209 N. W. 364.

"Where a servant voluntarily and of his own motion exposes himself outside the scope of his regular employment without or against the order of the master or vice-principal and is injured thereby the master is not liable." 24 Cyc. 1224.

"An unaccepted offer by way of compromise is not evidence against the party making it." 20 Century Dig. § 745.

"An offer or attempt to compromise or settle a matter in dispute cannot be given in evidence against the party by whom such offer or attempt was made." Busch v. S. D. Cent. R. Co. 29 S. D. 44, 135 N. W. 757; Boylan v. McMillan, 114 N. W. 630.

BIRDZELL, J. On December 10, 1924, William J. Storm was killed while working in a mine near the village of Hanks. The mine was operated by one or more individuals under the name of Hanks Coal Company. By reason of the failure of the employer to comply with the provisions of the Workmen's Compensation Act, the deceased was not insured. In January, 1925, his widow made application to the Workmen's Compensation Bureau for an award under § 11 of the Compensation Act. Proceedings were thereafter had whereby, in March, 1925, an award was made. The award was not paid and in July of the following year this action was brought, with the consent of the state, to enforce the award as a liquidated claim. The only issues presented to the jury were as to the employment of Storm at the time —whether he was employed by Kohlman, one of the defendants, or by all of the defendants—and whether the injuries resulting in his death were received by him in the course of his employment. The jury returned a general verdict in favor of the plaintiff and against the de-

fendants. Thereafter, upon motion of the defendants for judgment non obstante or for a new trial, judgment non obstante was ordered in favor of all the defendants except Kohlman, and as to him judgment was entered on the verdict. He appeals from the judgment and from the order denying the motion. The plaintiff has likewise appealed from the order granting judgment non obstante as to the defendants James Hought and David Hought. The principal question in both appeals concerns the sufficiency of the evidence; in the appeal of Kohlman, the sufficiency of the evidence to establish that the injury was received in the course of the employment of the deceased, and, in the appeal of the plaintiff, the sufficiency of the evidence to establish that the respondents were employers.

First considering Kohlman's appeal: The undisputed evidence is to the effect that on the 10th day of December, 1924, William Storm went to work in the mine at about one o'clock in the afternoon; that he was found dead in the last room in entry No. 2 at about 2:30. He was first found by one Shaw, an employee engaged as a mule driver, hauling coal as loaded by the various miners and distributing empty cars. He had supplied Storm with four empty cars about 1 o'clock, and about 2:30 he discovered Storm's body. There was no one else working in that entry. Between 1 and 2:30 o'clock Storm had loaded either one or two cars and part of another. One Jens Hagen, who had become a lessee of the mine shortly after the accident in question but who at the time of the accident was working in the mine, testified by deposition that he was working as pit boss; that it was his duty to go about the mine twice a day and investigate the places where the men were working; that he had been pit boss for three months before the accident occurred; that Storm's working place on the 10th of December was the first and second room necks; and that the room farthest east, the one in which the body was found, was worked out and abandoned on the 9th of December in the morning. Storm had worked it out, and his working place on the 10th of December was a small room or coal bank adjacent to and immediately west of the room neck of the first room. On the morning of the 9th he had given Storm orders with respect to where he should work. He told him to stay out of the east room because it was not fit for one to be in there any longer; it was dangerous. The room had been abandoned because there was no more coal to get.

It had all been taken out except about one thousand pounds and that was cleaned up on the morning of the 9th. Storm had finished removing the pillars on the 9th and had no work to do in that place on the 10th. He told him different times to stay out and told him once in the presence of Ted Gilbertson, another employee in the mine. Gilbertson did not testify. When the body of Storm was found crushed beneath coal which had fallen from overhead, his pick was by his side. The evidence shows that the main entry to the mine runs from north to south; that entry No. 2 branches off the main entry toward the east; that along entry No. 2 there are four rooms along the south side of the entry, each approximately, including walls, twenty-four feet wide and approximately one hundred feet deep or long; that during the mining operations these rooms are made by mining out a narrow strip the length or depth of the proposed room and widening the operations so as to remove all coal from the room except sufficient to leave a substantial wall between the particular room and the adjacent room; also leaving a substantial block or pillar of coal toward the front of the room to protect the entry, so that when a room is mined out there is left a narrow room neck some twenty feet or less in length leading into the mined-out room. It seems that most of the large pillar or bank of coal adjacent to the room neck in the room farthest east of entry No. 2, where the body was found, had been mined out and removed and that the next working place assigned to Storm was upon the front bank or pillar of the room immediately west.

It is argued that, since the undisputed evidence shows that Storm's work in the room where his body was found had ended the day before, that this room had been abandoned and that he had been ordered to remain out of it and assigned to a definite location elsewhere, it must be held that the injuries resulting in his death were received outside of the course of his employment. It is urged that it was the duty of the pit boss to assign the miners to their respective places of work and to direct their operations and the duty of the miners to work only at the places so assigned. Various sections of chapter 168 of the Laws of 1919, chapter 38, article 70a of the 1925 Supplement to the Compiled Laws of 1913, are relied upon to support the contentions advanced. Section 69 of this chapter (§ 3084a69 of the 1925 Supplement to the Compiled Laws of 1913) is cited as providing, among other things, that no

workman shall disobey an order given in pursuance of law, or do a wilful act whereby the lives and health of persons working therein or the security of a mine or machinery connected therewith may be endangered; and § 71 (§ 3084a71 of the 1925 Supplement to the Compiled Laws of 1913) as providing that each employee shall go to and from his place of duty by traveling the ways provided and that he shall not travel around the mine or the buildings where duty does not require.

The Workmen's Compensation Law defines "injury," for which compensation is intended to be provided, as meaning an injury arising in the course of employment, but as not including "injuries caused by the employee's wilful intention to injure himself or to injure another." Section 396a2 of the 1925 Supplement to the Compiled Laws of 1913. Does the fact that the employee at the time he received his injury was working in disregard of instructions and at a place other than that to which he had been assigned render the injury one not arising in the course of employment or bring it within the class of injuries caused by the employee's wilful intention to injure himself or to injure another? It is the duty of employees to comply with and obey the orders of the employer. Workmen's Compensation Acts, C. J. 86. But disobedience does not necessarily remove the employee from the course of his employment nor convict him of entertaining a wilful intention to injure himself or another. "A sharp distinction is drawn," says Elliott on Workmen's Compensation Acts, 7th ed. 50, "between doing of a thing recklessly or negligently which a workman is employed to do and the doing of a thing altogether outside and unconnected with what he is employed to do, and if an accident happens in the former case it arises out of and in the course of the employment, but not in the latter case. 'There are prohibitions which limit the sphere of employment and prohibitions which only deal with conduct within the sphere of employment. A transgression of a prohibition of the latter class leaves the sphere of employment where it was, and consequently will not prevent the recovery of compensation. A transgression of the former class carries with it the result that the man has gone outside the sphere.' " The same distinction is expressed in somewhat different language in Glass on Workmen's Compensation Law, as follows (48):

"Ordinarily, where workmen are not employed to work with machinery or in close proximity thereto, they are held not entitled to com-

pensation for injuries received where they voluntarily put themselves in a position to be injured thereby. . . . An accident does not arise out of the employment if, at the time, the workman is arrogating to himself duties which he was neither engaged nor entitled to perform. But the courts are inclined not to be too severe upon workmen who are injured by attempts to further the master's business, although the attempt is in a line somewhat outside the precise scope of the employment," and (52): "If the act which caused the injury was within the scope of the servant's employment, the mere fact that he had been expressly forbidden to do that act will not necessarily be fatal to his claim."

The above authorities are quoted with approval in Eugene Dietzen Co. v. Industrial Bd. 279 Ill. 11, 116 N. E. 684, Ann. Cas. 1918B, 764, 14 N. C. C. A. 125, and are reproduced as a quotation from the Illinois case in 1 Schneider, Workmen's Compensation Law, § 292. We are of the opinion that the distinction suggested is a sound one, particularly in view of the avowed purpose of our Workmen's Compensation Act to provide compensation for workmen injured in hazardous employments regardless of questions of fault (§ 1). Obviously, if every departure from an order or direction should be construed as placing the employee for the time being out of the course of his employment and as subjecting him to the risks incident to the employment, it would be possible to so circumscribe his activities with rules and regulations as to shift to him a substantial share of the risk which the law clearly intends to cast upon the fund or the employer. Hence, the policy of the law, in a large measure, could be defeated. Where, however, the employee engages upon a line of activity that is not within the scope of his particular employment, a different situation is presented. A few illustrations taken from the decided cases may serve to clarify the distinction in mind. We set them forth without necessarily approving the application of the principle under the facts in each case.

Where a coal miner had been ordered to cut a road in the mine and where he left this work and went to cut coal in a part of the mine where he had been forbidden by special rule to cut any and he undermined some props and caused a fall, which killed him, it was held the accident did not arise out of the employment. Weighill v. South Heaton Coal Co. 4 B. W. C. C. 141.

Where a mine employee left his regular working place and went to another section of the mine into an old abandoned opening where no duty or business called him, being some five hundred feet distant from his proper working place, and there caused an explosion resulting in his death, it was held that the injury was one not in the course of his employment. Kuca v. Lehigh Valley Coal Co. 268 Pa. 163, 110 Atl. 731. ·

Where a miner disregarded instructions and entered a gaseous section of a coal mine guarded by a barrier at the opening, with notice and a guard, as required by law, and while there ignited a fuse causing an explosion which injured him, it was held that the injury did not arise in the course of his employment. Walcofski v. Lehigh Valley Coal Co. 278 Pa. 84, 122 Atl. 238.

Where one was employed to pick rock and slate from a coal chute at a mine and in violation of specific orders attempted to move a car which was then being loaded, a duty assigned to another set of employees known as spraggers, it was held that the injury sustained while so doing was not sustained in the course of his employment. West Side Coal & Min. Co. v. Industrial Commission, 291 Ill. 301, 126 N. E. 218.

Where one employed as a spragger or brakeman in moving cars, in violation of the provisions of the Mine Act, entered the engine, started it backward and caused an accident resulting in his death, his injuries were not received in the course of his employment. Shoffler v. Lehigh Valley Coal Co. 290 Pa. 480, 139 Atl. 192.

On the other hand, where a miner had been instructed by the foreman to complete his work in a particular shaft and then go to another shaft, where the foreman was located, and work there, and where, after completing his work in the shaft, he went to the surface and stopped temporarily to rest in the shade of an ore bin, which collapsed and killed him, it was held that he was not guilty of wilful misconduct such as would deprive his beneficiaries of compensation. Brooklyn Min. Co. v. Industrial Acci. Commission, 172 Cal. 774, 159 Pac. 162.

In the case at bar, we are of the opinion that, in view of the happening of the accident at a place in the immediate vicinity of the place where the employee was assigned to work and of the evidence which shows that it was his duty to conduct whatever operations were necessary in the particular room before abandoning it, and that he was work-

ing there as a miner at the time, it cannot be said, as a matter of law, that the injury was sustained outside of the course of the employment or that it was caused by a wilful intention of the employee to injure himself or another.

The plaintiff contends that the lower court erred in granting the motion of the defendants James Hought and David Hought for judgment non obstante. Prior to February, 1924, one John M. Nelson, otherwise known as John M. Nelms, together with Kohlman and the two Houghts, operated the mine in question as partners under the name of the Hanks Coal Company. In February, 1924, Nelson died. The question on this branch of the case is whether or not, upon the dissolution of the partnership occasioned by the death of one of the partners, the mine continued to be operated by the remaining partners or whether it was operated by Kohlman alone; or, more specifically, whether it was being operated by Kohlman alone on December 10, 1924. Kohlman testified that in the month of July, 1924, he had an agreement with James Hought in regard to the mine to the effect that Hought would turn the property over to him in consideration of the latter's assumption of the debts; that he then commenced to pay the debts of the partnership and that he ran the mine thereafter, James Hought not having anything further to do with it; that the land on which the mine is located was owned by James Hought and himself; that it was still in the name of the partners in December, 1924; that he could not put the quitclaim deed on record because the taxes were not paid; that he got the quitclaim deed in 1925; that he made an agreement with Hought in July and that Hought had written him a letter to the effect that he would turn the property over in the month of August. He could not say the date of the letter. He got separate quitclaim deeds, one from James Hought and his wife, and another from David Hought in January, 1926. He applied for a license for operating the mine under the name of the Hanks Coal Company. He did not make the application for a license for himself personally, doing business as the Hanks Coal Company. He never represented to the state that he was operating the coal mine. At the time he took over the coal mining business there were no agreements except the letter from James Hought. There was no letter when he bought David Hought's interest. There was a quitclaim need. That was in 1926; but he had said in 1924 that he did not want to have

anything more to do with the mine. He had talked the matter over with David Hought in July, 1924, but he never met James Hought until he got the quitclaim deed in 1925. He did not operate the mine after Storm was killed. He leased the mine to the pit boss, Jens Hagen, and he ran it from the 20th of December, 1924, until April 1, 1925, paying a royalty of twenty-five cents a ton. There were papers signed at that time—a written contract, but the witness did not have it. The lease was made out in duplicate. It was signed by nobody other than the witness and Hagen. He no longer had the lease and could not say whether he had lost it.

Kohlman further testified that on the day Storm was killed he and James Hought called at the Storm residence and asked Mrs. Storm if he might have a conversation with her and that he was directed to come back the next day; that he stated to her that he wanted to make a settlement with her; that he had sent a telegram to James Hought at Noonan asking him to come, and the latter came in response to the telegram. Neither of the Houghts was called as a witness in the case. The land remained of record in the names of the partners. The partnership name was never changed and nothing was done to apprise the public of any change in the ownership between February and December, 1924. This, together with the absence of documentary evidence to establish the changed relations and the admission involved in the conduct of Kohlman in wiring James Hought to come upon the happening of the accident and of the conduct of the latter in coming and approaching the widow for the purpose of effecting a settlement, affords, in our judgment, sufficient evidence to sustain a verdict that the Houghts were still interested in the operation of the mine and that they were employers of Storm at the time of his death.

A further contention is advanced on behalf of the defendants to the effect that the court erred in permitting evidence to be introduced showing that there were negotiations for settlement. The evidence was that Kohlman immediately wired James Hought, that he came and that the two went to see Mrs. Storm for the purpose of effecting a settlement. In view of the issue tendered with respect to the change of ownership and the personnel of the employers, this evidence was clearly admissible and it was proper to comment upon it, as was done, in the argument to the jury. In a case such as the one at bar, where the liability

is not predicated upon the fault of the defendant but exists from the mere fact of the non-payment of premiums into the Workmen's Compensation Fund, if the employee was injured in the course of the employment, admissions implied from negotiations for settlement are necessarily much more limited in their capacity to prejudice the jury than is ordinarily the case. There was no request for a cautionary instruction limiting the evidence to its effect as an admission of ownership or interest by James Hought, and to its tendency to impeach the witness. We are of the opinion that the defendants have had a fair trial.

It follows from what has been said that the order granting judgment non obstante in favor of the defendants James Hought and David Hought should be reversed and that the judgment rendered on the verdict should stand. It is so ordered.

NUESSLE, Ch. J., and CHRISTIANSON, BURKE, and BURR, JJ., concur.

## On Petition for Rehearing.

BIRDZELL, J. In a petition for rehearing exception is taken to a statement of fact in the opinion as follows: "He (Kohlman) had talked the matter over with David Hought in July, 1924, but he never met James Hought until he got the quitclaim deed in 1925." It is said that the record shows that Kohlman and James Hought had talked over the dissolution of the partnership and an arrangement whereby Kohlman was to take over the mine prior to the death of Storm. The statement in the opinion is an indirect quotation from the following testimony of Kohlman: "Q. I don't suppose you had any conversation or anything about that partnership after that? (That is, after Storm's death.) A. I never met Mr. Hought until I got the quitclaim deed, 1925. I have not been in Noonan since." It otherwise appears in the opinion that this statement cannot be literally true since Kohlman testified that he had sent for James Hought after the death of Storm and he and Hought had interviewed Mrs. Storm. It is equally inconsistent with his further testimony to the effect that he and James Hought had discussed the matter of Kohlman's taking over the mine. If this is an error in the statement of facts, it is founded upon the testi-

56 N. Dak.—43.

mony relied upon by the defendants, and it may be conceded that the testimony when interpreted is to the effect that Kohlman and James Hought had discussed the matter before the death of Storm.

It is further urged that the defendants James Hought and David Hought should be permitted to obtain a ruling of the trial court upon the motion for a new trial. In disposing of the plaintiff's appeal from the order granting the Hought's judgment non obstante, this order is reversed and the reversal, of course, carries with it the right to have judgment rendered on the verdict. But this should be and is without prejudice to the right of the defendants to obtain a ruling of the trial court on that portion of their motion—the motion for a new trial—which was undisposed of. Nelson v. Grondahl, 13 N. D. 363, 100 N. W. 1093.

The petition is denied.

NUESSLE, Ch. J., and BURKE, BURR, and CHRISTIANSON, JJ., concur.